# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 358 | **DATE** | 12/14/2000 |
| **CASE TITLE** | BEM I, L.L.C. vs. Anthropologie, Inc. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. The court grants Anthropologie's motion in part and denies it in part (81-1), confirms the Award (except insofar as the prejudgment interest is concerned) and Supplemental Award, and consequently dismisses BEM's Complaint in Forcible Entry and Detainer. BEM's motion to confirm Counts V and VI of the First Amended Claim (82-2) is also granted, but its motion to vacate (82-1) is denied. The Nagle Firm's motion to dismiss (84-1) is granted in part and denied in part.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | **Document Number** |
|---|---|---|---|---|
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | DEC 15 2000 | |
| | Notified counsel by telephone. | | date docketed | **101** |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 12/14/2000 | |
| | | | date mailed notice | |
| ETV | courtroom deputy's initials | | ETV | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

ED-7
FILED FOR DOCKETING
00 DEC 14 PM 6: 03

DEC 15 2000

| | |
|---|---|
| BEM I, L.L.C., an Illinois limited liability company,<br><br>        Plaintiff,<br><br>    v.<br><br>ANTHROPOLOGIE, INC., a Pennsylvania corporation,<br><br>        Defendant/Third Party Plaintiff,<br><br>    v.<br><br>BEM I, L.L.C., et al.,<br><br>        Third Party Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>No. 98 C 358<br><br>Judge<br>Rebecca R. Pallmeyer |

## <u>MEMORANDUM OPINION AND ORDER</u>

On May 19, 1996, Lake Shore Investments and Defendant/Third-Party Plaintiff Anthropologie, Inc. entered into a lease under which Anthropologie would be the "anchor tenant" in a retail complex to be constructed at 676 Central Avenue in Highland Park, Illinois (the "Leased Space"). Lake Shore assigned its interest in and obligations under the lease to Plaintiff BEM I, L.L.C on August 23, 1996. Anthropologie expected to open its Highland Park store for business on May 1, 1997; however, due to construction delays, it was not able to do so until August 20, 1997. These delays sparked a dispute as to when rent under the Lease was due and owing.

According to the lease, the Rent Commencement Date was ninety days after "Substantial Completion" of the Leased Space. BEM's architect, Third-Party Defendant

<u>101</u>

Nagle Hartray Danker Kagan McKay Architects Planners Ltd. (the "Nagle Firm"), issued its Certificate of Substantial Completion on June 20, 1997. BEM thus believed that rent became due on September 18, 1997, ninety (90) days thereafter. Anthropologie, on the other hand, contested both the legitimacy of the June 20, 1997 Certificate and the Rent Commencement date of September 18. It therefore paid no rent to BEM for its occupancy of the Leased Space during August, September, and October of 1997. Consequently, on December 29, 1997, BEM brought a Complaint in Forcible Entry and Detainer against Anthropologie. Anthropologie counterclaimed for breach of contract, and also brought a Third-Party Complaint against, *inter alia*, the Nagle Firm. Anthropologie's claims were, pursuant to the Lease, submitted to arbitration, and, on October 13, 2000, the panel of three arbitrators issued their award (the "Award"). The Panel (1) awarded Anthropologie $234,731.30 in lost profits and other damages, (2) found the true date of Substantial Completion to be August 19, 1997, and (3) determined that the Certificate was issued "in error," but was not a product of fraud or an "evident mistake."

Anthropologie has since brought a motion before this court to confirm the Award and BEM has brought a motion to confirm, in part, and vacate, in part, the Award. In addition to these motions, the Nagle Firm has brought a motion to dismiss Anthropologie's third-party claims against it. For the reasons below, the court grants Anthropologie's motion in part and denies it in part; grants BEM's motion in part and denies it in part; and grants the Nagle Firm's motion in part and denies it in part.

# FACTUAL BACKGROUND

## A. Parties

BEM is an Illinois limited liability company, all of whose members are citizens of Illinois, with its principal place of business in Illinois. (Exhibit A ("Third Party Complaint") to the Nagle Firm's Memorandum in Support of its Motion to Dismiss Anthropologie's Third-Party Complaint ("Nagel Firm Memo"), ¶ 2.) Anthropologie is a Pennsylvania corporation with its principal place of business in Pennsylvania. (*Id.* ¶ 1.) The Nagle Firm is an Illinois professional corporation with its principal place of business in Illinois. (*Id.* ¶ 5.)

## B. The Owner-Architect Agreement

On January 25, 1996, Lake Shore and the Nagle Firm entered into a Standard Form of Agreement Between Owner and Architect (the "Owner-Architect Agreement") concerning the multi-tenant building that was to be constructed at 696 Central Street, Highland Park, Illinois. (Exhibit D to the Nagle Firm's Memo.) According to Section 2.6.6 of the Owner-Architect Agreement, "the Architect shall not have control over or charge of and shall not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, since these are solely the Contractor's responsibility under the Contract for Construction." (*Id.* at § 2.6.6.) Section 9.7 of the Owner-Architect Agreement states that "nothing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a third party against either the Owner or Architect." (*Id.* at § 9.7.)

## C. The Lease

On May 19, 1996, almost four months after the execution of the Owner-Architect Agreement, Lake Shore and Anthropologie entered into the Lease. (Third Party Complaint, ¶ 8.) As already noted, Lake Shore later assigned its interest in and obligations under the Lease to BEM on August 23, 1996.[1] (Id. ¶ 12.) The initial term of the Lease is ten years, over the course of which Anthropologie is obligated to pay more than $2.7 million in rent and other charges. (*BEM I, L.L.C. v. Anthropologie, Inc.*, No. 98 C 358, 1999 WL 1212643, at *2 (N.D. Ill. Dec. 14, 1999).) In addition, the Lease reserves for Anthropologie an option to extend the original term for two successive five-year periods. (*Id.*) In the event of certain defaults by the Tenant, the Lease gives the Landlord the option to terminate the Lease, to repossess the Leased Space and to continue to hold the Tenant liable for the remaining rent due through the end of the Lease term as liquidated damages. (Exhibit 2 (the "Lease") to BEM's Memorandum in Support of its Motion to Vacate, In Part, and Confirm, In Part, Arbitration Award ("BEM's Memo in Support"), § [22](c).)

The Lease contains a number of provisions relevant to the present disputes. First, concerning the commencement of rent obligations, Section [3](b) provides that the target date for "Substantial Completion" of the Leased Space is March 1, 1997. (*Id.* §[3](b)). "Substantial Completion" is later defined in Section 2(d) of Exhibit B to the Lease (the "Work Letter

---

[1]     The record does not indicate whether Lake Shore assigned its interest in and obligations under the Owner-Architect Agreement to BEM or whether the Nagle Firm and BEM entered into a new and separate owner-architect agreement after August 23, 1996.

Agreement") as "the date of completion of Landlord's Work pursuant to the Final Improvement Plans, in conformance with the terms, covenants, conditions, and provisions of the Lease and this [Work Letter] Agreement and in conformance with all applicable Laws, all as certified by Landlord's Architect . . . ." (Work Letter Agreement, § 2(d)). According to the Lease, the Rent Commencement date is 90 days after the date of Substantial Completion. (Lease, §[3](d)). Then, "commencing on the Rent Commencement Date, Tenant shall pay Landlord the monthly installment of annual Minimum Rent at the Annual Minimum Rental Rate (as set forth in Paragraph J of the Schedule of Terms) on the first day of each calendar month during the Initial Lease Term and any Extension Term, in advance and without prior notice or demand." (*Id.* §[5](a).)

With respect to remedies, Section [3](b) provides:

> Notwithstanding the foregoing, Landlord agrees that if Landlord has not . . . Substantially Completed Landlord's Work by June 30, 1997, all such dates being of the essence of this Lease . . . then and in any such events Tenant may by written notice to Landlord given at any time thereafter until items (x), (y) and (z), as the case may be, have occurred, elect to terminate this Lease and all of Tenant's obligations hereunder, which shall be Tenant's sole and exclusive remedy for any such failure by Landlord, with neither party hereto thereafter having any further rights, liabilities or obligations hereunder.

(*Id.* §[3](b)). Section [23] then states, in relevant part:

> If . . . Landlord contests such default, right to cure, expenditures or damages within the aforesaid thirty (30) day period, then the dispute with respect thereto shall be submitted by the parties hereto to the American Arbitration Association for arbitration pursuant to its commercial rules then in effect in Chicago, Illinois. Landlord and Tenant agree to cooperate fully with each other, and with the appointed arbitrator(s), so that a decision with respect to Landlord's contest may be rendered as soon as possible. Landlord and Tenant further agree that any such decision shall be final and binding on both of them

as to the subject matter thereof.

(*Id.*, § [23].) Finally, Section [42] of the Lease states that "this Lease shall be construed, interpreted and governed by the laws of the State in which the Leased Space is situated." (*Id.*, § [42].)

BEM's work was admittedly not complete by March 1, 1997. (BEM's Memo in Support, at 2.) The Nagle Firm ultimately issued its Certificate of Substantial Completion ("Certificate") on June 20, 1997. (*Id.*) Two months later, on August 20, 1997, Anthropologie's Highland Park store finally opened for business. (BEM's Memo in Support, at 3.) Because Anthropologie believed that, as of June 20, 1997, there were "serious material defects which would deny it the use and enjoyment of the Leased Space," it did not consider the Rent Commencement date to be September 18, 1997. (Third Party Complaint ¶ 18.) It therefore did not commence payment of rent to BEM on October 1, 1997, as it would have otherwise been obligated to do pursuant § [5](a) of the Lease.[2]

Consequently, on December 29, 1997, BEM filed its Complaint in Forcible Entry and Detainer (the "Complaint") in Lake County, Illinois. In the Complaint, BEM sought possession of the Leased Space and $48,197.23 in rent allegedly due from September 18, 1997 through November 30, 1997. (Exhibit A to Anthropologie's Notice of Removal ("Complaint")). BEM later moved to amend the Complaint to increase the *ad damnum* clause

---

[2]    In fact, Anthropologie did not begin to pay rent until it was ordered to do so by Judge Gottschall in approximately February or March of 1998. (Doc. 76 (Transcript of Proceedings Before the Honorable Rebecca R. Pallmeyer, July 29, 1999), at 4-5.)

to $87,811.39 for additional rent owed since the time of filing. (Exhibit D to Anthropologie's Notice of Removal.) It ultimately withdrew this motion, (Exhibit E to Anthropologie's Notice of Removal), but Anthropologie nevertheless removed the action to the Northern District of Illinois, where it was assigned initially to Judge Gottschall.[3]

## D. Anthropologie's Counterclaim and Third-Party Complaint

On January 30, 1998, Anthropologie filed its answer to BEM's Complaint which included four affirmative defenses and asserted a two-count counterclaim (the "Counterclaim"). (Doc. 2.) The four affirmative defenses were as follows: (1) any rent due was to be set off by the Lease's Tenant Improvement Allowance which Anthropologie had not yet received;[4] (2) no rent was due because the Rent Commencement date had not yet occurred; (3) any rent due was to be set off by delay damages; and (4) any rent due was to be set off by Anthropologie's right to reimbursement. (*Id.*) As for the Counterclaim, its first

---

[3]     Anthropologie removed the action to federal court pursuant to 28 U.S.C. § 1441(b), asserting the existence of federal jurisdiction under the diversity statute, 28 U.S.C. § 1332. Although BEM had sought only $48,197.23 in rent, Anthropologie specifically stated that the amount in controversy exceeded the sum of $75,000. On December 13, 1999, this court, with reservation, denied BEM's motion to remand the cause to state court. *See BEM I, L.L.C. v. Anthropologie, Inc.*, No. 98 C 358, 1999 WL 1212643, at *6-7 (N.D. Ill. Dec. 14, 1999). The court concluded that the value of possession included the amount of back rent due *at the time of the removal*. While the Complaint may not have claimed this full amount, the back rent due at the time the case was removed to this court was $87,811.39.

[4]     Pursuant to § [17] of the Lease, BEM was obligated to contribute $125,000 to Anthropologie "on account of [Anthropologie's] costs to perform Tenant's Work, which shall be paid as a reimbursement to [Anthropologie]." The court does not purport to resolve the dispute, if any, between Anthropologie and BEM over this Tenant Improvement Allowance.

count stated an action for lost profits and delay damages based upon BEM's breach of Section [3](b) of the Lease, and the second count stated an action for reimbursement pursuant to Section [23] of the Lease. (*Id.*) On May 11, 1998, Judge Gottschall concluded that the entire Counterclaim, and Anthropologie's third and fourth affirmative defenses, were subject to arbitration. (Doc. 27.) On May 27, 1998, Judge Gottschall denied Anthropologie's motion to reconsider the May 11, 1998 Order. (Doc. 29.)

On June 3, 1998, Anthropologie filed a Third-Party Complaint against BEM, Harold Eisenberg (a member of BEM), Max Plzak (an employee of BEM), and the Nagle Firm. Count I of the Third Party Complaint alleged that BEM, Eisenberg and Plzak used only "half-hearted efforts" to obtain the required approval from the City of Highland Park because it had no intention of complying with its obligations under the Lease. In Count II, Anthropologie alleged that BEM, Eisenberg, Plzak and the Nagle Firm entered into a fraudulent conspiracy to prevent Anthropologie from exercising its rights under the Lease in connection with the issuance of the Nagle Firm's Certificate. Count III, similar to Count II, alleged that the issuance of the Certificate, if not fraudulent, was an "evident mistake." Count IV alleged that the Nagle Firm undertook a contractual obligation to Anthropologie, implied in law, to properly issue the Certificate, and that the Nagle Firm breached this obligation. Finally, Count V alleged that by improperly issuing the Certificate, the Nagle Firm breached its contractual obligation to Anthropologie, a direct and intended third-party beneficiary of any contract that the Nagle Firm may have entered into with either Lake Shore or BEM. The Nagle Firm answered this Third-Party Complaint on June 30, 1998 (Doc. 39),

and filed an amended answer on July 6, 1998 (Doc. 41).

E.    **The Arbitration and Consequent Awards**

Anthropologie and BEM proceeded to arbitration on Anthropologie's six count First Amended Claim ("FAC") (Exhibit B to the Nagle Firm's Memo) before a three-member panel (the "Panel") beginning on July 12, 2000. The arbitration hearing spanned nine days and involved testimony from fifteen witnesses. (Anthropologie's Memorandum in Support of Motion to Confirm Arbitration Award, at 8.) The Panel consisted of Daniel Burns, Lowell Sachnoff, and Stanley Sklar, all well-respected experts in the fields of real estate and construction law. (*Id.* at 7.) The Nagle Firm was not a party to this arbitration. (Nagle Firm's Memo at 3.)

The counts of the FAC were as follows: Count I sought lost profits for the delay in opening the new Anthropologie store and delay in obtaining BEM's approval of exterior signage; Count II sought damages for construction items which Anthropologie claimed it had to complete on its own; Count III alleged that Anthropologie was fraudulently induced to enter into the Lease and sought punitive damages for this inducement; Count IV alleged fraud during the performance of the contract; Count V alleged that the Nagel Firm's Certificate was fraudulently issued; and, Count VI claimed that the Nagel Firm's Certificate was demonstrably false and, at the very least, an evident mistake.

On October 13, 2000, some sixty days after the conclusion of the hearing, the Panel rendered its Award (Exhibit 1 to BEM's Memo in Support). In summary, the Panel concluded: (a) as to Count I, Anthropologie was to receive $185,767, representing damages

due to construction delays caused by BEM; (b) as to Count II, Anthropologie was to receive $48,964.30 in damages, for, *inter alia*, sprinkler modification and fire safety installation; (c) as to Count III, the record failed to support any showing of fraud by BEM, and therefore no punitive damages were to be awarded; (d) as to Count IV, no further award was necessary because the Panel found in favor of Anthropologie and against BEM on Counts I and II; (e) as to Count V, "Substantial Completion" occurred on August 19, 1997, the date upon which the fire safety system was connected to the City of Highland Park, and that the Certificate of Substantial Completion executed by the Nagle Firm was therefore issued in error; (f) as to Count VI, the Certificate was not demonstrably false, and BEM therefore prevailed on that claim. In all, the Panel awarded Anthropologie $234,731.30. In addition, it awarded Anthropologie "interest from June 27, 1997 to the date of payment . . . at a rate of 8.5% per annum simple interest."

Then, on December 1, 2000, the Panel rendered the Supplemental Award of Arbitrators. In this Supplemental Award, the Panel awarded Anthropologie $296,695 for its attorneys fees, costs and expenses plus interest thereon at 9.5% from December 1, 2000 until the Supplemental Award is paid.

Now before the court are (1) Anthropologie's motion to confirm the Award,[5] (2)

---

[5]      On December 8, 2000, Anthropologie also filed a motion to confirm the Supplemental Award. BEM has indicated its opposition to this motion. The court's discussion herein does not speak to the particulars of the Supplemental Award. Notwithstanding that fact, the court believes that its analysis of the Federal Arbitration Act's broad confirmation and narrow vacatur standards and consequent confirmation of the Panel's
(continued...)

BEM's motion to vacate, in part, and confirm, in part, the Award, and (3) the Nagle Firm's motion to dismiss Anthropologie's Third-Party claims against it.

## DISCUSSION

### I. Motions to Confirm and Vacate the Arbitration Award

#### A. Choice of Law

As noted earlier, Section 42 of the Lease states that "this Lease shall be construed, interpreted and governed by the laws of the State in which the Leased Space is situated." The Leased Space is situated in Illinois. Based on this language, BEM argues that the court's review of the arbitration awards should be governed by the Illinois Uniform Arbitration Act ("IUAA"), 710 ILCS 5/1 *et seq.* Anthropologie, on the other hand, insists that the court's review should be governed by the Federal Arbitration Act ("FAA"). 9 U.S.C. § 1 *et seq.* The FAA provides that "a written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The "involving commerce" standard is read broadly by courts to extend to the limits of Congress' Commerce

---

[5](...continued)
Award directs its confirmation of the Supplemental Award as well. If, however, BEM seeks to raise objections to the Supplemental Award that it did not raise as to the Award, it should inform the court by way of a motion to reconsider. The court further notes that its discussion of BEM's prejudgment interest argument herein, *see infra* Section I.C.4., is not necessarily applicable to the Supplemental Award, which attached only post-judgment interest.

Clause powers. *See Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273-277 (1995) (holding that the FAA governed a contract between an Alabama homeowner and an Alabama franchise of a multistate termite control company). The court notes that such a broad reading of the FAA would encompass the leasing transaction in the present case, where a Pennsylvania corporation is leasing commercial property from an Illinois corporation.

The court must nevertheless still determine whether the Lease's choice-of-law provision demands that the court analyze the parties' confirmation and vacatur arguments under the IUAA. In order to make this determination, the court relies on the Supreme Court's pronouncement in *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995). The contract at issue in *Mastrobuono* contained a provision requiring arbitration of disputes pursuant to the rules of the National Association of Securities Dealers ("NASD"), which allow for punitive damage awards. The contract also included a general choice of law provision applying New York law, which prohibits arbitrators from issuing punitive damage awards. The *Mastrobuono* Court concluded that the NASD rules would govern and, in doing so, stated:

> We think the best way to harmonize the choice-of-law provision with the arbitration provision is to read [the provision] to encompass substantive principles that [state] courts would apply, but not to include special rules limiting the authority of arbitrators. Thus, the choice-of-law provision covers the rights and duties of the parties, while the arbitration clause covers arbitration; neither sentence intrudes upon the other.

*Id.* at 63-64. *Mastrobuono* has been read to mean that "a general choice of law provision in a contract will not extend to the arbitration clause, absent specific evidence the parties intended

it to do so." *State Farm Mutual Automobile Ins. Co. v. George Hyman Constr. Co.*, 306 Ill. App. 3d 874, 715 N.E.2d 749 (4th Dist. 1999). *See also Paul Davis Systems of Northern Illinois, Inc. v. Paul W. Davis Systems, Inc.*, No. 98 C 2027, 1998 WL 749041, at *1-2 (N.D. Ill. Oct. 15, 1998) (holding an arbitration provision to be governed by the FAA despite the contract's general Florida choice-of-law provision). Here there is no evidence that the parties to the Lease intended § [42], the choice-of-law provision, to extend to §[23], the arbitration clause. The court thus holds that the arbitration clause in the Lease is governed by the FAA.

**B.     Motions to Confirm Counts IV and V of the First Amended Claim**

Before it tackles the more difficult question of vacatur, the court must first discuss the parties' motions to confirm the Panel's decision on Counts V and VI of the FAC. To repeat, the Panel's decision on these counts was that while the Certificate issued by the Nagle Firm may not have been fraudulent or the product of "evident mistake," it was issued "in error." Section 9 of the FAA states that "at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9. Because neither party has opposed the other's motion to confirm the Panel's decision on Counts V and VI of the FAC, the court hereby confirms such counts, and enters judgment thereon, in accordance with § 9.

**C.     Motion to Vacate Counts I through IV of the First Amended Claim**

The Panel's decision with respect to Counts I through IV of the FAC requires more

attention. As with Counts V and VI, Anthropologie has moved, pursuant to § 9 of the FAA, to confirm the Award on these counts. BEM, on the other hand, has moved, pursuant to § 12(a)(3) of the IUAA, to vacate the Award on these counts because the Panel "exceeded their powers" by committing gross legal error. In particular, BEM argues that the Panel improperly (1) ignored the Lease's exclusive remedy provision, (2) awarded lost profits to a new store at a new location, and (3) awarded prejudgment interest on unliquidated sums and then set an interest rate higher than that allowed by Illinois statute. The court, based on its analysis in Section I.A., will consider BEM's motion to vacate under the standard set forth in § 10(a)(4) of the FAA–which, like § 12(a)(3) of the IUAA, turns on whether the arbitrators have somehow overstepped their bounds. *See* 9 U.S.C. § 10.[6]

---

[6]     Section 10 of the FAA states, in relevant part:
(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration--
  (1) Where the award was procured by corruption, fraud, or undue means.
  (2) Where there was evident partiality or corruption in the arbitrators, or either of them.
  (3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.
  (4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.
  (5) Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators.

### 1. Standard of Review

Judicial review of an arbitrator's award under the FAA is "extremely limited." *Moseley, Hallgarten, Estabrook & Weeden, Inc. v. Ellis*, 849 F.2d 264, 267 (7th Cir. 1988). *See also Local Union No. 1 v. Interstate Brands Corp.*, No. 99 C 2522, 2000 WL 126798, at *1 (N.D. Ill. Feb. 1, 2000) ("Judicial review of an arbitration award has been characterized as among the narrowest known to the law."). To be sure, in addition to the statutory grounds set forth in § 10 of the FAA, a court "will set aside an arbitrator's decision if, in reaching his result, the arbitrator deliberately disregards what he knows to be the law." *See Eljer Mfg., Inc. v. Kowin Dev. Corp.*, 14 F.3d 1250, 1254 (7th Cir. 1994). Under the FAA, however, "errors in the arbitrator's interpretation of law or findings of fact do not merit reversal . . . ." *Id. See also Flexible Mfg. Sys. Pty. Ltd. v. Super Products Corp.*, 86 F.3d 96, 100 (7th Cir. 1996) ("Factual or legal errors by arbitrators–even clear or gross errors–do not authorize courts to annul awards . . . .") (quoting *Gingiss Int'l, Inc. v. Bormet*, 58 F.3d 328, 333 (7th Cir. 1995)); *Eastern Associated Coal Corp. v. United Mine Workers of America, District 17*, 121 S.Ct. 462 (2000) ("'[A]s long as [an honest] arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' the fact that 'a court is convinced he committed serious error does not suffice to overturn his decision.'") (quoting *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987)).

Under this extraordinarily narrow standard of review,[7] the court now addresses and

---

[7] The court notes its decision to review BEM's vacatur argument under the FAA, (continued...)

rejects each of BEM's three substantive arguments.

## 2.    The "Exclusive Remedy" Provision

The court rejects BEM's claim that the Panel committed gross legal error by ignoring

what it labels the "exclusive remedy" provision in § [3](b) of the Lease. Again, this language

stated:

> Notwithstanding the foregoing, Landlord agrees that if Landlord has not . . .
> Substantially Completed Landlord's Work by June 30, 1997, all such dates
> being of the essence of this Lease . . . then and in any such events Tenant *may*
> by written notice to Landlord given at any time thereafter until items (x), (y)
> and (z), as the case may be, have occurred, elect to terminate this Lease and all
> of Tenant's obligations hereunder, which shall be Tenant's sole and exclusive
> remedy for any such failure by Landlord, with neither party hereto thereafter
> having any further rights, liabilities or obligations hereunder.

*See* Lease, § [3](b) (emphasis added.)  BEM claims that, according to this "unambiguous Lease

language," Anthropologie's only appropriate response to BEM's delay was to terminate the

Lease.  That is simply not the case.  Judge Gottschall considered this argument more than a

year ago and rejected it.  On April 17, 1998, she concluded that § [3](b) of the Lease, which

---

[7](...continued)
as opposed to the IUAA, has no bearing on the ultimate outcome in this case; the "exceeded
their power" standards, as already mentioned, are practically the same.  One slight difference,
which the court wishes to note, is that in Illinois, gross errors of judgment in law or a gross
mistake of fact will not vitiate an arbitration award *unless the mistakes or errors are apparent
on the face of the award.  See Rauh v. Rockford Products Corp.*, 143 Ill. 2d 377, 390, 574 N.E.2d
636, 642 (1991).  In rare instances, then, an Illinois court will overturn an arbitrator's award
for gross legal error.  An example of such a blatant error would be if the Panel, on the face
of its award, explicitly relied on a statute that had since been amended or a case that had since
been overruled.  *See Heatherly v. Rodman & Renshaw, Inc.*, 287 Ill. App. 3d 372, 376, 678
N.E.2d 59, 62 (1st Dist. 1997).  As will be demonstrated herein, the arbitrators in the present
case did not commit "gross error" of this sort.

contains the permissive "may" as opposed to the mandatory "shall," should be interpreted so as not to preclude Anthropologie from electing to pursue damages as opposed to a termination of the Lease. *See* Transcript of Proceedings Before the Honorable Joan B. Gottschall, April 17, 1998, at 43 ("So I think what [the relevant language of § [3](b)] has to be read as meaning is that if the Tenant makes the selection, then that is your only remedy, but it doesn't mean that you must make the election because it clearly makes it optional. . . . [T]hat's how I'm going to construe it.") Moreover, the Panel, apparently intrigued by this legal issue, asked the parties to brief it in their post-hearing memoranda. In compliance with this request, and in support of its interpretation of § [3](b), Anthropologie cited *Professional Executive Center v. LaSalle Nat'l Bank*, 211 Ill. App. 3d 368, 379, 570 N.E.2d 366, 373 (1st Dist. 1991) ("Illinois courts interpret the word 'may' as permissive and 'shall' as mandatory in private contracts."). The Panel was presumably persuaded both by Judge Gottschall's Order and by Anthropologie's position. This court, under the standard of review outlined above, cannot and will not overturn the Panel's decision.

### 3. Lost Profits

BEM next challenges the Panel's decision to award Anthropologie $185,767 in lost profits for what the Panel determined to be inappropriate construction delays. BEM argues that, in Illinois, lost profits are not available to a new store at a new location because such damages are inherently speculative. To support this assertion, BEM cites, *inter alia*, *SK Hand Tool Corp. v. Dresser Industries, Inc.*, 284 Ill. App. 3d 417, 427, 672 N.E.2d 341, 348 (1st Dist. 1996) ("Illinois courts have long held as a general rule that while profits lost due to business

interruption or tortious interference with a contract may be recovered, the business must have been established before the interruption so that the evidence of lost profits is not speculative."). The Seventh Circuit, however, disposed of a strikingly similar argument in *Eljer* where one party to an arbitration agreement disputed the arbitrator's award of over $8 million in speculative profits to the other party. *Eljer*, 14 F.3d at 1255. In upholding the arbitrator's award, the *Eljer* court stated:

> Contrary to Eljer's reading, a court can modify an arbitrator's decision under section 10(a)(4) [of the FAA] only if the arbitrator exceeds the powers delegated to him by the parties. In this case, whether or not the claim is permitted under the applicable law is irrelevant under 10(a)(4). Nor can we hold that the arbitrator's award was in deliberate disregard of the law. As we have stated repeatedly, mere error in the interpretation of the law (as opposed to failure to decide in accordance with relevant provisions of law) does not provide grounds for disturbing an arbitration award.

*Id.* at 1256. As in *Eljer*, under the relevant standard of review, BEM's lost profits argument must fail. The issue was clearly one before the Panel. In fact, Judge Gottschall specifically said in her May 11, 1998 Order that "the arbitrator should also consider claims that lost profits were incurred because of the landlord's alleged defaults," and both parties briefed the issue in their post-hearing submissions to the Panel. Furthermore, BEM has presented absolutely no evidence that the Panel deliberately disregarded the law. Granted, the Panel did not provide a lengthy explanation of its rationale for granting lost profits damages; but, it was under no obligation to do so. *See Eljer*, 14 F.3d at 1254 ("[A]n arbitrator is simply not required to state the reason for his decision."). For these reasons, the court refuses to vacate the Panel's Award of lost profits.

### 4. Prejudgment Interest

BEM's final challenge to the October 13, 2000 Award focuses on the Panel's attachment of 8.5% per annum simple interest dating back to June 27, 1997. BEM argues that, under Illinois law, the Panel (a) was not authorized to award Anthropologie prejudgment interest because the amount due was not ascertainable, and (b) even if the Panel legitimately believed the amount due was ascertainable, it committed gross legal error by setting the interest rate above the maximum of 5% allowed by Illinois statute. *See* 815 ILCS § 205/2 ("Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing.").

In light of the extremely narrow standard of review set forth above, the court is inclined to confirm the Panel's decision. This inclination is bolstered by Sections [23] and [40] of the Lease which evidence the Panel's authority to grant interest as part of any remedy. Section [23] specifically provides that any arbitration be governed by the Commercial Rules of the AAA. According to Commercial Rule 45(a) and (d), "arbitrators are authorized to grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties," including "interest at such rate and from such date as the arbitrator(s) may deem appropriate . . . ." *See* Commercial Arbitration Rules, *at* http://www.adr.org/rules/commercial/commercial_rules.html. Section [40] then states that:

> any payment of any sums hereunder, or sums advanced or expended to or on

behalf of one of the parties hereto by the other party, whether by Landlord to Tenant, or by Tenant to Landlord, which is not made or repaid when due shall accrue interest at the prime rate of interest then charged by Chase Manhattan Bank (or its successor) plus one percent (1%) per annum (the "Default Rate") from the date which is ten (10) days after the due date through the date of collection or set off, as the case may be.

Unfortunately, unlike the issue of lost profits, the parties did not discuss prejudgment interest in their post-hearing briefs. The court is thus unable to determine whether the Panel considered the legal issues surrounding a grant of interest, what authority it relied on in its resolution of the issue, or why it chose the interest rate of 8.5%. Notwithstanding its inclination, then, the court must receive further clarification from the parties before making an ultimate determination as to the propriety of the interest award. The parties are invited, within ten days, to submit additional briefs to this court concerning the bases for the Panel's decision to award prejudgment interest at a rate of 8.5%. Alternatively, the parties might seek clarification from the Panel as to their calculation of the prejudgment interest award.

Accordingly, the court denies BEM's motion to vacate Counts I through IV of the Panel's Award, and, correspondingly, grants Anthropologie's motion to confirm such counts. *See* 9 U.S.C. § 9 ("[A]ny party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order *unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title.*"). With respect to prejudgment interest, however, at this time, the court, denies both Anthropologie's motion to confirm and BEM's motion to vacate.

### D. Anthropologie's Requested Dismissal of BEM's Complaint

Anthropologie requests that if this court confirms the Panel's decision with respect to the Substantial Completion date, as it has now done, it should dismiss BEM's Complaint in Forcible Entry and Detainer. BEM's December 29, 1997 Complaint in Forcible Entry and Detainer was predicated on a "Substantial Completion" date of June 20, 1997 (and corresponding rent commencement date of September 18, 1997). Anthropologie argues that because the Panel has since found the Substantial Completion date to be August 19, 1997 (and corresponding Rent Commencement Date to be November 19, 1997), BEM's entire claim is invalidated. The court agrees.

The Lease states that "the date on which Landlord's Work shall be Substantially Complete . . . shall be the Commencement Date," § [3](b), and that the "Rent Commencement Date shall be the date which is ninety (90) days after the Commencement Date," § [3](d). The first monthly installment of the annual Minimum Rent is then due on the first day of the next calendar month. The Panel determined that "Substantial Completion" occurred on August 19, 1997. Therefore, the appropriate Rent Commencement Date was not September 18, but rather November 17, 1997. According to § [5](a) of the Lease, then, the first installment of annual Minimum Rent was due on December 1, 1997. Because the Complaint was predicated on the non-payment of rent from September 18 to November 30, and no rent was due and owing during that period, the court dismisses BEM's Complaint.

## II.    The Nagle Firm's Motion to Dismiss

### A.    Rule 12(c)

The court now turns to the Nagle Firm's motion which asks the court to dismiss (or, in the alternative, grant it judgment on) Counts II through V of Anthropologie's Third-Party Complaint.    On a procedural note, because the Nagle Firm filed its answer to Anthropologie's Third-Party Complaint prior to filing its present motion, and because it has not complied with the Rule 56.1 of the Local Rules of the United States District Court for the Northern District of Illinois, the court will treat the Nagle Firm's motion as a 12(c) motion for judgment on the pleadings rather than as one to dismiss or for summary judgment. *See Republic Steel Corp. v. Pennsylvania Engineering Corp.*, 785 F.2d 174 (7th Cir. 1985).    Thus, in deciding upon the Nagle Firm's motion, the court must accept all well-pleaded allegations in the Third-Party Complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Spearman Indus., Inc. v. St. Paul Fire & Marine Ins. Co.*, 109 F. Supp.2d 905, 906 (N.D. Ill. 2000).

### B.    Counts II and III of the Third-Party Complaint

The Nagle Firm's motion argues that, under the doctrine of collateral estoppel, Counts II and III should be rejected based on the Panel's finding that the Nagle Firm issued the Certificate "in error" as opposed to fraudulently or by "evident mistake." Perhaps convinced by the Nagle Firm's collateral estoppel argument, Anthropologie did not seriously contest the dismissal of Counts II and III in its Response Brief.

Despite Anthropologie's apparent concession, the court nevertheless briefly addresses

the merits of the Nagle Firm's collateral estoppel argument. Collateral estoppel precludes relitigation of issues in a subsequent proceeding when (1) the party against whom the doctrine is asserted was a party to the earlier proceeding; (2) the issue was actually litigated and decided on the merits; (3) the resolution of the particular issue was necessary to the result; and (4) the issues are identical. *Kraushaar v. Flanigan*, 45 F.3d 1040, 1050 (7th Cir. 1995). The rule in Illinois is practically the same. *See, e.g., Taylor v. Peoples Gas Light & Coke Co.*, 275 Ill. App. 3d 655, 660, 656 N.E.2d 134, 139 (1st Dist. 1995). Arbitration awards may be given the same collateral estoppel effect as court judgments. *See Boston Cattle Group v. ADM Investor Svcs., Inc.*, No. 94 C 4673, 1995 WL 723781, at *6 (N.D. Ill. 1995) ("To determine whether collateral estoppel is applicable . . . the court must examine the record, including the pleadings, the evidence submitted, *and any findings of the arbitrator.*") (emphasis added). *See also Peregrine Financial Group, Inc. v. Martinez*, 305 Ill. App. 3d 571, 578, 712 N.E.2d 861, 867 (1st Dist. 1999) ("Generally, arbitration awards have the same res judicata and collateral estoppel effect as court judgments."). Furthermore, "application of collateral estoppel is committed to the sound discretion of the trial court." *O'Neill v. Merrill Lynch, Pierce, Fenner & Smith*, 654 F. Supp. 347, 351 (N.D. Ill. 1987).

In Counts II and III, Anthropologie alleges that the Certificate issued by the Nagle Firm was a product of fraud or an evident mistake. On this identical issue, the Panel found that not to be the case. The Nagle Firm now asserts estoppel against Anthropologie, which was undisputedly a party to the arbitration. In light of the Panel's Award, and in what it considers to be its sound discretion, the court grants the Nagle Firm's motion to dismiss

Counts II and III on the grounds of collateral estoppel.

## C.     Counts IV and V of the Third-Party Complaint

In Count IV, Anthropologie alleges that "the Nagle Firm breached its [implied] contractual obligation and duty of due care [to Anthropologie] because there was no factual or good faith basis for the issuance of [the Certificate]" on June 20, 1997.  In Count V, Anthropologie all but acknowledges that there was no implied contract between it and the Nagle Firm, but, in the alternative, attempts to assert its rights as a third-party beneficiary of any agreement between the Nagle Firm and either Lake Shore or BEM.  On both counts, Anthropologie seeks actual damages.  The Nagle Firm requests that these counts be dismissed because (1) Anthropologie cannot seek a tort remedy for economic losses, and (2) according to both its conduct and its express written contract with BEM, the Nagle Firm was not contractually bound to Anthropologie in any way.

The court first considers and summarily rejects the Nagle Firm's economic loss argument because while a plaintiff cannot seek a tort remedy for economic losses, *see Bethlehem Steel Corp. v. Chicago Eastern Corp.*, 863 F.2d 508, 524-25 (7th Cir. 1988) (applying Illinois law), here, Anthropologie has alleged damages resulting from the Nagle Firm's breach of contract.  The Nagle Firm's second argument, though, the non-existence of either an implied contract or third-party beneficiary relationship, is far more convincing.  The court addresses the implied contract and third-party beneficiary arguments separately and in turn.

### 1.     Implied Contract

In Illinois, "a contract implied in fact is one whereby a contractual duty is imposed by

reason of a promissory expression which may be inferred from the facts and circumstances and the expressions on the part of the promisor." *Foiles v. North Greene Unit District No. 3*, 261 Ill. App. 3d 186, 190, 633 N.E.2d 24, 27 (4th Dist. 1994). Such a contract arises "where the intention of the parties is not expressed, but an agreement in fact creating an obligation is implied or presumed from their acts; in other words, where circumstances under a common understanding show a mutual intent to contract." *Id.* Moreover, a contract implied in fact must contain all elements of an express contract, such as offer, acceptance, and consideration, and there must be a meeting of the minds. *Id.*

In support of its argument that the Nagle Firm had an implied contractual obligation to issue it a proper Certificate, Anthropologie relies on language in (a) Section 2(d) of the Work Letter Agreement which defines "Substantial Completion" to mean "the date of completion of Landlord's Work pursuant to the Final Improvement Plans . . . all as certified by Landlord's Architect . . . in favor of Tenant" and (b) Section 12.2 of the Owner-Architect Agreement which states that "the Architect will be coordinating the design drawing prepared by the MEP [mechanical, electrical, and plumbing] contractors with the documents for general trades." In addition to its reliance on this language, Anthropologie attached numerous letters to its Memorandum of Law in Opposition To Nagle Hartray's Motion to Dismiss Third Party Complaint ("Anthropologie's Memo in Opp. To Nagle Firm"). *See* Anthropologie's Memo in Opp. To Nagle Firm, Exhibits A-E.) In these letters, BEM "repeatedly accused both the Nagle Firm and Micro [the contractor] of failing to perform their contractual obligations, and threatened to hold them responsible for [BEM's] defaults

under the Lease." *Id.* at 9. Not one of the five letters that Anthropologie appended to its Memo in Opp. To Nagle Firm, however, was sent from either Anthropologie or the Nagle Firm to the other. Thus, Anthropologie has not alleged facts that would indicate a "meeting of the minds," nor have they alleged facts as to what, if any, consideration the Nagle Firm received or was to receive from Anthropologie in return for the fulfillment of its alleged contractual duties. Anthropologie is correct to assert that the Nagle Firm had certain contractual obligations arising out of the transaction at issue; however, those were obligations owed, not to Anthropologie, but to BEM. The court therefore grants the Nagle Firm's motion on the pleadings on Count IV.

### 2.     Third-Party Beneficiary

In Count V, Anthropologie argues that it was an intended beneficiary of the Owner-Architect Agreement. In order to determine whether one is an intended third-party beneficiary of a contract, a court must look to the contract to determine the intent of the primary parties. *See Federal Ins. Co. v. Turner Constr. Co.*, 277 Ill. App. 3d 262, 268, 660 N.E.2d 127, 131-32 (1st Dist. 1995). With respect to construction contracts, Illinois courts have stated that "[i]t is not enough that the parties to the contract know, expect or even intend that others will benefit from the construction of the building in that they will be users of it. The contract must be undertaken for the plaintiff's direct benefit and the contract itself must affirmatively make this intention clear." *Id.* (holding that a tenant was not a third-party beneficiary of a subcontractor on a building project because the tenant was not expressly identified as a third-party beneficiary in the contractor/subcontractor contract) (quoting

*Waterford Condominium Assoc. v. Dunbar Corp.*, 104 Ill. App. 3d 371, 373, 432 N.E.2d 1009, 1011 (1st Dist. 1982)).

In Count V of the Third-Party Complaint, Anthropologie refers to a contract that the Nagle Firm entered into either with BEM or with Lake Shore. The Nagle Firm attached to the Nagle Firm Memo a contract entered into between it and Lake Shore on January 25, 1996–the aforementioned Owner-Architect Agreement. At that point in time, January 25, 1996, the parties could not have contemplated that Anthropologie would be a direct beneficiary of the contract because Anthropologie had not yet entered into the Lease. In fact, there is nothing in the Owner-Architect Agreement evidencing an intention to benefit anyone other than the primary parties. To the contrary, the Owner-Architect Agreement clearly states that "nothing contained [herein] shall create a contractual relationship with or cause of action in favor of a third party against either the Owner or Architect." Owner-Architect Agreement, § 9.7. *See also Waterford Condominium Assoc. v. Dunbar Corp.*, 104 Ill. App. 3d at 374, 432 N.E.2d at 1012 ("The terms of the contract are controlling with respect to the rights of a third-party beneficiary. Liability cannot be extended beyond the terms of the contract merely on the ground that the situation and circumstances of the parties justify further liability."). If this is the one and only agreement that Anthropologie is referring to in Count V, which the court suspects is the case, then Anthropologie cannot prevail. On a 12(c) motion, though, the court must draw all reasonable inferences in favor of Anthropologie. It is possible, while not probable, that Anthropologie was referring to another agreement. Accordingly, the court denies the Nagle Firm's motion for judgment on

the pleadings on Count V, and expects that a summary judgment motion will likely dispose of the matter.

## CONCLUSION

For the foregoing reasons, the court grants Anthropologie's motion in part and denies it in part (81-1), confirms the Award (except insofar as the prejudgment interest is concerned) and Supplemental Award, and consequently dismisses BEM's Complaint in Forcible Entry and Detainer. BEM's motion to confirm Counts V and VI of the First Amended Claim (82-2) is also granted, but its motion to vacate (82-1) is denied. The Nagle Firm's motion to dismiss (84-1) is granted in part and denied in part.

ENTER:

Dated: December 14, 2000

REBECCA R. PALLMEYER
United States District Judge